# STATE OF MICHIGAN

# COURT OF APPEALS

---

SHERRY HORROCKS and BRUCE
RZEPCZYNSKI,

       Plaintiffs-Appellants,

and

CUTTING CREW LAWN CARE,

       Plaintiff,

v

CITIZENS INSURANCE COMPANY OF
AMERICA,

       Defendant-Appellee,

and

HANOVER INSURANCE GROUP, NULTY
AGENCY INC, and VANDAM & KRUSINGA
BUILDING AND RESTORATION INC,

       Defendants,

and

CITY OF PARCHMENT,

       Other Party.

UNPUBLISHED
January 25, 2018

No.   335972
Kalamazoo Circuit Court
LC No.   2014-000370-NO

---

SHERRY HORROCKS and BRUCE
RZEPCZYNSKI,

       Plaintiffs-Appellees,

and

-1-

CUTTING CREW LAWN CARE,

      Plaintiff,

v

CITIZENS INSURANCE COMPANY OF
AMERICA,

      Defendant-Appellant,

and

HANOVER INSURANCE GROUP, NULTY
AGENCY INC, and VANDAM & KRUSINGA
BUILDING AND RESTORATION INC,

      Defendants,

and

CITY OF PARCHMENT,

      Other Party.

No. 336480
Kalamazoo Circuit Court
LC No. 2014-000370-NO

Before: MARKEY, P.J., and HOEKSTRA and RONAYNE KRAUSE, JJ.

PER CURIAM.

In Docket No. 335972, plaintiffs, Sherry Horrocks and Bruce Rzepczynski, appeal by right the trial court's order granting summary disposition in favor of defendant, Citizens Insurance Company of America (Citizens), as to plaintiffs' claims of negligence and breach of contract. The trial court had previously dismissed their claims of fraud and intentional infliction of emotional distress, and plaintiffs do not appeal that decision. This case arises out of mold and water damage, and apparently eventual structural problems, at a house owned by Horrocks and used both for living and conducting a business. In Docket No. 336480, Citizens appeals by right the trial court's denial of case evaluation sanctions despite the fact that Citizens had accepted a case evaluation award that had actually favored plaintiffs, and plaintiffs rejected that award. We affirm the trial court's grant of summary disposition. We vacate the trial court's denial of case evaluation sanctions and remand for clarification, retaining jurisdiction.

The house at issue was covered by a homeowner's insurance policy from Citizens obtained through defendant Nulty Agency, and the business was covered by a business insurance policy issued by defendant Hanover Insurance Group. It is functionally undisputed that plaintiffs discovered a leak in the roof on January 8, 2014, with attendant water intrusion into the structure, although the parties dispute the severity of either the initial damage or amount of water intrusion.

The gravamen of this matter is a dispute over exactly what transpired thereafter and the propriety of either party's participation therein, but at least for summary disposition purposes, it is not disputed that the structure eventually became uninhabitable and plaintiffs suffered health problems due to mold exposure.

Taking plaintiffs' complaint at face value for purposes of this appeal, Horrocks promptly notified an agent at Nulty, who referred Horrocks to Vandam & Krusinga Building and Restoration (Vandam), to evaluate and repair the damage, and Vandam referred her to Joel Newton, a structural estimator. Plaintiffs contend that the only thing Vandam and Newton did was put a tarp up on the roof and explain how to keep it clear of snow. Horrocks contacted Ryan Bieszard, a claims adjuster, at Citizens on January 10, 2014; and Newton advised Bieszard that it would be appropriate to retain a structural engineer. Citizens sent Bud Schoch, an engineer, to plaintiffs' property on January 13, 2014; Schoch allegedly noted that the roof had undersized rafters and was wet on the inside, indicative of water running into the kitchen due to ice dams. The next day, Horrocks advised Bieszard that "water was all over the place in the home" and she was undertaking great efforts to keep the house and its contents dry, to which Bieszard responded that Horrocks "had to use 'due diligence' to protect her property."

Plaintiffs' complaint continues that Bieszard performed a cursory and superficial inspection of the premises on January 15, 2014, noted that it was "'going to be a costly fix,'" noted visible water damage and the efforts Horrocks was taking to keep the interior dry, and failed to notice any of the damage in the attic. The essence of plaintiffs' complaint appears to be:

> [Bieszard] should have offered Ms. Horrocks alternative living arrangements given her home was not safe given the roof had partially collapsed and water was dripping into the home from ice dams that developed in the attic. Furthermore, [Bieszard] should have offered pursuant to Ms. Horrocks' policy to have a mitigation company come in to perform the tear out of water damaged materials and the drying of her home. Ms. Horrocks should not have had to perform this activity other than performing some initial wiping up the water coming in the kitchen. It was not her obligation to dry the home as it continued dripping water from the ice dams.

In effect, plaintiffs' case hinges to a great extent on the assertion that defendant, an insurance company, was supposed to be her advisor. In any event, as noted there appears to be no dispute for purposes of summary disposition that the ongoing water intrusion caused structural damage and the growth of hazardous mold.

Plaintiffs contend that over the next couple of weeks, Horrocks engaged in a variety of other communications or attempted communications with Bieszard, Bieszard's supervisor Chris Winkler, and Newton. Horrocks eventually retained a company called Wonder Makers to conduct an air sample in her house, which revealed mold contamination, and she asserts that "[t]his was the first time anyone had properly advised of the dangers of water damage contamination." Plaintiffs contend that she obtained the sample against Bieszard's instruction and after Winkler advised her that defendant "would not consider purchasing a trailer until work commenced on the home," which had not begun because no agreement was in place to do so.

Meanwhile, Horrocks's health conditions deteriorated, and allegedly Bieszard hung up on her several times.

Of note, defendant contends that Horrocks was routinely abusive during conversations, particularly citing a collection of emails that certainly reflect a great deal of expressed frustration. Defendant further contends that in fact it offered to move Horrocks into a hotel on February 19 and 20, 2014, but Horrocks expressly declined and did not authorize mold removal. Plaintiffs themselves recorded a telephone call between Horrocks and Winkler on February 19, 2014, in which Winkler explicitly told Horrocks that the expense of staying in a hotel would *not* come out of the $5,000 cap for mold coverage, and appears to have suggested that it would even be possible to find a hotel that would accommodate her cats. Plaintiffs moved out of the house and into a hotel on March 10, 2014.

Plaintiffs assert that it was, or should have been, obvious that Horrocks did not know how to abate mold and that she was completely unequipped even to make the attempt. Plaintiffs further assert that defendant's failure to promptly retain a qualified mitigation service or advise plaintiffs to retain one, or at least advise plaintiffs of how dangerous mold exposure could be, exposed plaintiffs and the building to severe and unnecessary harm. Plaintiffs assert that defendant improperly failed to approve mitigation, and that defendant had "taken control of the work performed" by failing to provide proper authorizations and instead telling plaintiffs to "use 'due diligence.'"

Plaintiffs allege that defendant committed a breach of their insurance contract "by failing to provide all coverages afforded under the policy." Plaintiffs also contend that defendant committed negligence or gross negligence by failing to provide proper authorization for mitigation services, failing to advise plaintiffs how to engage in mitigation, failing to advise plaintiffs about the risks they faced from water damage contamination, failing to advise plaintiffs to leave the premises, and failing to advise plaintiffs that they should not be performing mitigation themselves. Plaintiffs also allege that the same general conduct constituted fraudulent concealment by failing to disclose information defendant was obligated to disclose, and intentional infliction of emotional distress because it was extreme, outrageous, and perpetrated for an ulterior motive. As noted, the latter two claims were dismissed and are not pursued on appeal.

We first address defendant's argument that plaintiffs are inventing new arguments on appeal. We disagree. Plaintiffs' complaint asserts that defendants failed to properly advise plaintiffs how to mitigate water damage and induced plaintiffs to remain in their home and engage in their own efforts at mitigation even though insurance coverage existed to perform the job. At most, plaintiffs make a more *detailed* argument, but this is not a fraud claim that must be pleaded with specificity. Otherwise, "Michigan is a notice-pleading state," and so the complaint need only ensure that a defendant need not guess at the nature of the claims against it. *Johnson v QFD, Inc*, 292 Mich App 358, 368; 807 NW2d 719 (2011). It would be a surprise *not* to find a claim more fully fleshed-out and detailed in a subsequent argument than outlined in a complaint. In any event, appellate consideration is not precluded merely because a party makes a more sophisticated or more fully-developed argument on appeal than was made in the trial court. See *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002). We do not find plaintiffs' arguments unpreserved.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*., 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*., 119-120. The interpretation of a contract is reviewed de novo as a question of law. *Klapp v United Ins Group Agency*, *Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

Plaintiffs contend, generally, that defendant breached the insurance policy contract and that defendant's conduct independently constitutes negligence. Regarding plaintiffs' contractual claim, we first note that defendants are unambiguously correct in pointing out that *only* Horrocks satisfies the definition of an "insured" under the terms of the insurance policy. Furthermore, nothing in plaintiffs' complaint seems to suggest that Rzepczynski ever had any interactions with defendant or any of defendant's agents. It would be devoid of even arguable legal merit for plaintiffs to suggest that it was improper for the trial court to dismiss any claim by Rzepczynski against defendant premised on breach of contract.

Second, defendant correctly cites "Section I – Conditions," subsection 3.2, of the insurance policy, which explicitly provides that defendant "will pay no more than the actual cash value of the damage until actual repair or replacement is complete," and only after that completion will defendant pay the limit of liability, the full actual replacement cost, or the full actual repair cost. In other words, plaintiffs simply cannot contend that defendant had a duty under the contract to pay for repair, replacement, or remediation work in excess of the value of the damage until *after* the work was fully performed. Consequently, plaintiffs simply may have had to incur expenses for which they would subsequently be compensated up to the limits of coverage under the policy. A plain reading of the second amended complaint indicates that plaintiffs expected defendant to pay various remediation entities up front, which simply does not appear to be required under the policy.

Plaintiffs argue that they simply did not have the funds to pay up front out of pocket, and it is "egregious" to suggest that they should do so before their insurance would take effect. This may be true. However, it is a matter of common knowledge that many contractors will set up payment plans, especially if it can be shown that there is insurance to pay after the fact. Furthermore, as noted, the policy does call for defendant to pay for the value of the damage, and defendant did in fact give plaintiffs thousands of dollars "up front." In any event, the fact that a contract proves to arguably be a bad deal is neither a defense to a breach nor a basis for finding one. It is worth noting that on February 19, 2014, Horrocks was explicitly informed that defendant had determined that alternate living expenses—i.e., moving into a hotel, possibly even with her cats—was not restricted to the $5,000 cap for mold coverage, with a strong implication that she ought to move out, but she appears to have declined to do so. Nothing in the contract suggests that defendant had any obligation or ability to insist upon it.

Additionally, defendant correctly points out that nowhere in the insurance policy is any requirement that defendant provide plaintiffs with advice, direction, management of remediation entities, or an assessment of plaintiffs' knowhow or skillsets. The obvious implication is that the policy simply expects that home ownership requires home owners to have some idea of how to manage problems with their building or how to outsource problem-solving. It is not implausible to argue, as will be discussed, that it might constitute negligence for defendant to give plaintiffs *bad* advice, but plaintiffs even concede that nothing in the parties' contract obligates defendant to give them any advice at all. Nonetheless, the policy unambiguously imposes upon the insured the duty to undertake mitigation, protection, repair, remediation, and other such necessary work. The upside to home ownership is the right and power to exercise essentially arbitrary control over every aspect of the structure; the downside is the potential *need* to do so. It is simply not unreasonable for insurance contracts to be premised on those facts to be commonly understood.

Finally, defendant argues that it never received a "proof of loss" from Horrocks. Defendant correctly observes that the contract requires an insured to "send to us, within 60 days after our request, your signed, sworn proof of loss" and that "Loss will be payable 60 days after we receive proof of your loss" and a few other conditions are met. The evidence shows that defendant sent a "proof of loss" form to Horrocks twice, on March 28 and on June 6, 2014, although only the latter explicitly asked her to fill it out and return it, with a note that she was required to do so under the policy. In an affidavit dated *after* the trial court's grant of summary disposition in this matter, a person claiming to be Horrocks's "former insurance agent" stated that he "personally went with her to her insurance agent at Nulte [sic] Insurance Agency to submit a proof of loss statement for her claim." Even supposing it was proper to consider evidence submitted for the first time on a motion for reconsideration, defendant is correct in noting that this does not prove that Horrocks actually returned the form to *defendant*.

In short, plaintiffs have accurately pointed out a number of *conditional* obligations defendant *could* be obligated to carry out under the insurance policy, but not that defendant ever became *actually* responsible for carrying them out. Defendant appears to have complied with the obligations it actually had, and Horrocks appears not to have complied with her own. Much of plaintiffs' argument is premised on what defendant *ought* to have done on, presumably, moral grounds. While such an argument is a sympathetic one, it is not a legal one.

Plaintiffs also present an argument to the effect that their breach of contract claims are not barred by accord and satisfaction. Defendant makes no accord and satisfaction argument on appeal, and in fact does not even *mention* such a concept anywhere in its briefs. The trial court likewise did not even mention accord and satisfaction in its decision on the pertinent motion for summary disposition. We presume plaintiff makes this argument as a preemptive strike against an anticipated argument, which is perfectly in order, but having already determined that the trial court properly dismissed plaintiffs' breach of contract claim for other reasons, we need not consider it.

The parties accurately agree that the existence of a contractual duty does not cause the evaporation of any preexisting "separate and distinct" duty a defendant would have owed to a plaintiff in any event arising out of common law or by statute. See *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 163-171; 809 NW2d 553 (2011). In *Loweke*, the issue was liability to a noncontracting third party. However, there is no dispute that the same principle

may apply if the plaintiff was a party to the contract. See *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 83-86; 559 NW2d 647 (1997). Consequently, failing to perform, or failing to perform competently, under a contract cannot itself give rise to tort liability, but if the same conduct violates an independently existing duty, the fact that it constitutes a breach of contract does not preclude tort liability.

Plaintiffs' core theory of tort liability appears to be the well-established principle that if a party undertakes to act, the party must do so reasonably and avoid causing foreseeable harm in the process, even if that act is pursuant to the execution of a contractual duty. *Hill v Sears, Roebuck and Co*, 492 Mich 651, 660-661; 822 NW2d 190 (2012). However, if the relationship between the parties is merely that of two parties to a contract, the execution by one party of its contractual responsibilities does not impose upon that party any further duties regarding related or nearby issues unless the party creates a wholly new hazard. *Id*. at 662-672. A contract between parties can create a relationship that will give rise to a duty of care, the violation of which may constitute negligence, but "the contract creates only the relation out of which arises the common-law duty to exercise ordinary care." *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967). Mere failure to perform under a contract is not itself a tort. *Hart v Ludwig*, 347 Mich 559, 565-566; 79 NW2d 895 (1956).

Plaintiffs emphasize that they appreciate that defendant was under no contractual obligation to act as their advisor. While plaintiffs do not articulate their negligence theory anywhere near so neatly, it appears to be premised on defendant's agents having nevertheless undertaken to give plaintiffs advice and direction that proved disastrous and should have been clearly improper to those agents at the time they rendered it. In broad theory, this is an entirely reasonable argument, especially in light of defendant's agreement that it had no obligation to give advice or direction. If supported by the evidence, such conduct would constitute a gratuitous act independent of the contract, in the context of a relationship established by the contract, that defendant would be obligated to perform non-negligently.

Nevertheless, plaintiffs' claims partially depend on a serious misunderstanding of the nature of the insurance policy contract. To the extent defendant's agents correctly advised Horrocks of the particulars thereof or outlined her options and left decisions based on those options to her, accurate reporting could hardly be considered negligent, and permitting plaintiffs to make their own fully-informed decisions is certainly not the creation or exacerbation of a hazard. Some of plaintiffs' argument appears to be that defendant's agents were made aware of the direness of the situation in plaintiffs' home and failed to act on that information or inform Horrocks of the dangers of mold, the availability of remediation entities, the insufficiency of her efforts, and so on. Thus, to some extent, plaintiffs appear to be arguing that defendant committed negligence by *not* gratuitously taking on additional duties beyond those established by contract. As discussed, the practical significance of the insurance policy is that the insured is obligated to undertake whatever protective or remediative efforts are necessary, and she will be compensated after the expenses are incurred and repairs or remediation is complete. Plaintiff's efforts to impose additional duties appear to misunderstand the insurance company's purpose.

Two arguments do have somewhat more apparent merit. First, plaintiffs argue that defendant initially misrepresented that the policy had a $5,000.00 cap on expenses arising out of mold damage, and the cost of packing up belongings and finding temporary accommodations

would come out of that cap. However, that is in fact what the policy provides, so it is not actually a misrepresentation. As noted, on February 19, 2014, defendant's agent advised Horrocks that because additional issues beyond the mold had been discovered on subsequent inspection, the $5,000.00 cap no longer applied, and plaintiffs would have available their full policy limits for, at least, accommodations. Theoretically, an argument could be made that defendant should have become aware sooner that other structural issues existed and that the $5,000.00 cap would not apply, but plaintiffs do not make that argument, and in any event, Horrocks's refusal to move out at that point, after the mold issues were well known, makes it almost impossible to conclude that the $5,000.00 cap was the cause of her damages.[1]

Furthermore, Horrocks testified that she began the process of packing up "immediately," so at least some of the damage resulting therefrom could not possibly be attributed to defendant. We have not been able to find anything cited by plaintiff to the effect that defendant's agents told her she must perform her own packing. In contrast, Bieszard testified that Horrocks did not wish to move out of the house and did not wish to permit anyone else to touch her items. Winkler likewise testified that Horrocks wished to perform the packing herself so that no one would touch her items, and also that she insisted on retaining the remediation firm on site and "[w]e can't change the mind of the insured."

Second, plaintiffs repeatedly assert that defendant's agents *instructed* them to undertake certain actions, such as personally packing items up into bins, that were in fact entirely the wrong thing to do under the circumstances. Again, this argument alone would, if the evidence supported a question of fact, warrant reversal of summary disposition, because, as noted, affirmatively giving plaintiffs bad advice and direction would constitute negligent rendering of an assumed duty. However, the evidence does not. Plaintiffs do not cite to any indication that defendant's agents gave them specific instructions or advice as to how to proceed, but rather repeatedly told them some variation on "do everything humanly possible" to clean or preserve the structure. Nowhere do plaintiffs appear to cite any evidence of defendant's agents specifically telling plaintiffs to take any particular action personally.[2] Advising Horrocks that it was her obligation under the policy to make decisions and take remedial or protective actions was simply an accurate explanation, although it appears clear that Horrocks never understood the situation.

In a nutshell, plaintiffs' argument is largely that even if defendant had no contractual obligation to act as their advisor, the parties' relationship generated some manner of common-law duty to give plaintiffs advice and direction. This is analogous to our Supreme Court's holding that appliance installers who placed an electric dryer in the plaintiff's home were not under any duty to take note of, rectify, or warn of an uncapped gas line that was located behind the dryer. *Hill*, 492 Mich at 662-669. Advising plaintiffs to do whatever they could to mitigate the situation does not amount to the creation of a new hazard or the exacerbation of an existing

---

[1] Horrocks testified that when plaintiffs did eventually move out into a hotel, they did take their cats.

[2] In their motion for reconsideration, plaintiffs did in fact cite to deposition testimony from Bieszard in support of an allegation that he specifically instructed Horrocks to remove falling ceiling tiles and drywall. However, the cited page of deposition transcript says nothing of the sort.

hazard. See *id*. at 671-672. Homeowners are expected to have a certain degree of obligation "to protect themselves from hazards *within their own homes*." *Id*. at 670 (emphasis in original). It follows that home ownership simply comes with an expectation that owners can and must resolve problems, or retain professionals to do so, autonomously.

The remainder of plaintiffs' argument amounts to misfeasance in the performance of contractual duties. Certainly, home owners have every right to expect agents of an insurance agency to provide accurate and complete information about their rights and responsibilities under their insurance policy, possibly even acting as an advisor within that very narrow context. However, the evidence simply does not show that defendant's agents misrepresented any of Horrocks's rights and responsibilities under the policy, with the possible—unargued—exception of whether defendant's agents should have known earlier that Horrocks had more than $5,000.00 available with which to work. Because we cannot obviously find evidence in the record so showing, we decline to consider this argument not made.

Consequently, we conclude that although plaintiffs have articulated a sound theoretical basis for finding defendant liable in tort independent of defendant's contractual obligations, plaintiffs have not shown that there is any question of fact whether there is any *actual* basis for such tort liability in this matter.

Finally, defendant argues that the trial court erred in declining to impose case evaluation sanctions in the amount of $44,529.05 on the basis of the "interest of justice." We are unable to decide this issue on this record and remand for clarification.

Pursuant to MCR 2.403(O)(1), a party that rejected a case evaluation award and has failed to obtain a more favorable outcome is required to pay the opposing party's actual costs. However, if the outcome of the action was the result of a motion entered after that rejection, the trial court has the discretion to refuse to award those costs. MCR 2.403(O)(11). There is no dispute that this matter was resolved by motion after the case evaluation rejection. Consequently, the trial court was empowered to invoke the "interest of justice" exception. *Haliw v City of Sterling Heights*, 266 Mich App 444, 447; 702 NW2d 637 (2005). The issue is whether the trial court did so properly.

A trial court's decision whether to apply the "interest of justice" exception to the otherwise mandatory imposition of case evaluation sanctions is reviewed for an abuse of discretion. See generally *Haliw*, 266 Mich App 444. An abuse of discretion occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). However, "[a] trial court necessarily abuses its discretion when it makes an error of law." *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016).

The "interest of justice" provision requires some manner of "unusual circumstances," examples of which might be some public interest in the litigation, misconduct or gamesmanship by the prevailing party, or possibly "excessive financial hardship." *Haliw*, 266 Mich App at 448-450. However, circumstances that will *not* justify the provision "without more" include some possible chilling effect on litigation, reasonableness of the rejection, or an economic disparity between the parties. *Id*. at 448, 450-451 (internal quotation omitted).

Defendant impliedly argues that on the basis of *Haliw*, no amount of economic disparity between the parties could ever justify the exception, which appears to be extrapolating too much from the decision. This Court made it clear that it was only presenting examples, and the exception could not be imposed if nothing exceptional was present. The disparity in economic power between the parties here is certainly a radical one. Furthermore, *Haliw* implied that there was a difference between what might be characterized as "ordinary" financial hardship, even if it was sufficient to chill potential future litigation, and "excessive" financial hardship, which this Court did not explore beyond noting that nothing of the sort was present in that case. Plaintiffs make a compelling argument that $44,529.05 is meaningfully different from the $1,500.00 award at issue in *Haliw*. Furthermore, the possibility of a trial court articulating other bases for the exception was specifically emphasized.

In contrast, plaintiffs argue that the law at issue in this matter was unsettled, or there was some public significance to the matter. We disagree. Plaintiffs simply did not have the understanding or skills to deal with the tragic situation in which they found themselves, with devastating consequences. The trial court appears to have accurately summarized the situation, that plaintiffs simply "had one view of the world that clearly was at odds with reality." Giving the proper amount of deference to the trial court's superior ability to evaluate the credibility of the parties before it, *McGonegal v McGonegal*, 46 Mich 66, 67; 8 NW 724 (1881), this merely establishes that plaintiffs carried on the instant litigation out of incomprehension rather than bad faith. Although very much to plaintiffs' credit, carrying on litigation in good faith is simply a normal expectation and thus definitionally not a basis for the "interest of justice" exception.

Thus, there are two questions present: whether a *significant* economic disparity between the parties or a *significant* economic hardship can legally be a basis for the "interest of justice" exception, and whether the trial court adequately articulated any such basis. The trial court, unfortunately, only clearly articulated its belief that plaintiffs genuinely felt they had no choice but to reject the case evaluation award.

We think that, upon de novo review and on the basis of the arguments the parties make here and made below, it could have been within the trial court's discretion to refuse to impose case evaluation sanctions. As noted, the economic disparity between the parties is enormous, and the economic hardship to anyone in plaintiff's position would border on the surreal. The trial court did not articulate an adequate basis, and we also decline to make the decision for the trial court, which would also have been within its discretion to refuse to apply the "interest of justice" exception. We explicitly do not prescribe an outcome, but we vacate the trial court's decision and remand to give the trial court an opportunity to more fully articulate its reasoning or reconsider its decision regarding case evaluation sanctions, as it deems appropriate.

In Docket No. 335972, the trial court's order granting summary disposition in favor of defendant is affirmed, and defendant, being the prevailing party, may tax costs pursuant to MCR

7.219(A).  In Docket No. 336480, the trial court's decision declining to impose case evaluation sanctions is vacated, the matter is remanded for rearticulation or reconsideration consistent with this opinion, and we direct that the parties shall bear their own costs.  MCR 7.219(A).  We retain jurisdiction.

/s/ Jane E. Markey
/s/ Joel P. Hoekstra
/s/ Amy Ronayne Krause

# Court of Appeals, State of Michigan

# ORDER

Sherry Horrocks v Citizens Insurance Company of America

Docket No.    336480

LC No.        2014-000370-NO

Jane E. Markey
Presiding Judge

Joel P. Hoekstra

Amy Ronayne Krause
Judges

Pursuant to the opinion issued concurrently with this order, the case in Docket No., 336480 is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 28 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded.  The proceedings on remand are limited to the matters indicated by this Court's opinion.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Jane E. Markey

January 25, 2018